# OCTOBER, 1929.

MARGARET GILSTRAP, RESPONDENT, v. OSTEOPATHIC SANATORIUM COMPANY, APPELLANT.

Kansas City Court of Appeals.   November 11, 1929.

*Waldo Edwards* and *George N. Davis* for respondent.

*Otho F. Mathews* and *Hunter & Chamier* for appellant.

BOYER, C.—This is a suit to recover damages for the death of plaintiff's husband, Raymie Gilstrap, alleged to have been caused by the negligence of the defendant, acting thru its agents and servants. The petition charges that the defendant, a corporation, was engaged in conducting a sanatorium and hospital, commonly known as the Still-Hildreth Osteopathic Sanatorium, for the treatment by surgery and Osteopathy of various diseases of patients received by it; that defendant maintained a staff and corps of physicians whom it held out to the public as being skilled and qualified to treat by osteopathy and surgery such patients as were received in said sanatorium; that defendant also employed a corps of attendants and nurses and held itself out as being prepared and equipped to perform such surgical operations as its said staff of osteopathic physicians, employed by it and connected with said sanatorium, saw fit to do; that all treatments and operations so performed by said physicians were performed for the profit and gain of the defendant; that defendant, thru its employees and agents, recommended that the tonsils of plaintiff's husband be removed and undertook to remove same by the operation known as tonsillectomy; that the agents and servants of defendant held themselves out and represented to plaintiff's husband that defendant was especially qualified to perform said operation, and that the staff of physicians employed by it were unusually skilled in said operation; that on the 8th day of September, 1928, plaintiff's husband entered into an agreement with the defendant, thru its staff of physicians, agents and officers, to have said operation performed, in pursuance to which he was received into said sanatorium at Macon, Missouri, as a patient for that purpose and that

thereupon, one Dr. McReynolds, he being one of the staff of physicians of said company intrusted with the care and treatment of patients received by it, undertook on behalf of the company to perform said operation and in so doing, unskillfully, negligently, and carelessly caused the death of plaintiff's husband; that said doctor negligently and carelessly failed to use the proper methods that should have been and are ordinarily used by persons possessing skill and learning ordinarily possessed and exercised by persons qualified so to do in that locality; that said Dr. McReynolds, while acting for said defendant negligently and carelessly failed to make the proper physical examination and failed to make the proper blood test to determine what might be expected from said operation; that the said Dr. McReynolds attempted to remove said tonsils by using a local anaesthetic and afterwards concluded that the operation could not be completed without the use of a general anesthetic and thereupon, acting for the defendant, decided to and did take plaintiff's husband to a hospital at Kirksville, Missouri, in order that a general anaesthetic might be administered and the operation there completed; that after Dr. McReynolds had attempted to remove the tonsils by the use of the surgical snare and the use of local anaesthetic, he inflamed, enlarged, and bruised the tonsils of plaintiff's husband and thereafter removed him to the Kirksville hospital where he was placed under a general anaesthetic, at which time the said Dr. McReynolds, as the servant and agent of the defendant and acting for it, did carelessly and in a negligent manner attempted to and did remove the tonsils of plaintiff's husband and negligently consumed in said operation approximately one hour; that during the course of which said time said Dr. McReynolds while acting for defendant and the use of the surgical knife, needle and other curgical instruments negligently severed the arties and blood vessels of a portion of them in the throat of plaintiff's husband and carelessly and negligently caused a dangerous hemorrhage in his throat, and that said Dr. McReynolds negligently and carelessly failed to discoved said hemorrhage in time to prevent the death of plaintiff's husband therefrom, and carelessly and negligently continued said operation for an unreasonable time while the said blood was flowing in dangerous quantities from the throat of plaintiff's husband; and negligently failed to use the proper method and methods at hand either to prevent or stop the flow of blood from plaintiff's husband's throat in time to save the life of plaintiff's husband, and allowed him to become so weakened from the loss of blood as to cause his death before he regained consciousness.

The answer was a general denial and various specific denials of the charges in the petition. Defendant admits that it was at the time charged a corporation duly organized and existing under the laws of the State of Missouri, for the sole purpose of treating mental

and nervous diseases according to osteopathy, and admits that it has been engaged in conducting and operating at Macon, Missouri, a sanatorium and hospital known as Still-Hildreth Osteopathic Sanatorium, but says that the same has always been operated solely for the purpose of treating mental and nervous diseases according to osteopathy without the employment of surgical operations. Defendant says that Dr. McReynolds did advise the operation for removal of tonsils of Raymie Gilstrap, the husband of plaintiff which operation was performed by him at the time mentioned in the petition at the American School of Osteopathy in the city of Kirksville, Missouri, and that soon thereafter the said Raymie Gilstrap died; that the said McReynolds did give to said Gilstrap a local anaesthetic in defendant's sanatorium, without the knowledge of defendant, and was done by McReynolds on his own responsibility, and that he acted on his own initiative without any direction or control on the part of defendant; that defendant had nothing whatever to do with said operation; that McReynolds was not employed by it to perform said operation and that his acts in respect thereto were without authority from defendant; that he was pursuing his own ends for his own purposes and was not about the defendant's business nor seeking to accomplish any of the defendant's purposes; that treatment by surgery was not a part of defendant's business; that Raymie Gilstrap employed said McReynolds to perform said operation and did not employ defendant to perform the same; that the said McReynolds was not acting as agent or employee of defendant, but was acting for himself as a surgeon under a contract between him and the patient and that Raymie Gilstrap was the patient of said McReynolds and not of the defendant; that said McReynolds was not within the scope of any authority, expressed or implied, from defendant in performing said operation; that defendant never made any contract or authorized said McReynolds to make a contract for it with said Gilstrap to remove his tonsils. The reply was a general denial.

There is no question raised against the pleadings, but their substance is here set out to indicate the position and theory of the parties throughout the case. A trial was had, resulting in a verdict for plaintiff in the sum of $6500, judgment followed, and defendant duly appealed.

Appellant contends that its instruction in the nature of a demurrer offered at the close of all the evidence should have been given for the reason, (1) there was no proof of agency, and (2) no proof of malpractice. We will, therefore, state fully the substance of all the evidence upon these subjects.

Plaintiff testified in her own behalf that she was the wife of Raymie Gilstrap at the time of his decease, September 8, 1928; that her said husband was employed by the De Laval Separator Com-

pany, earning a salary of $1900 a year, and was territory superintendent over sixteen counties in Missouri; that his condition of health was good; that about a month before his decease, he had some trouble with his tonsils which developed on a trip to Kansas, and which was an irritation of his throat; that under the direction of a doctor he used an atomizer with peroxide and water and practically healed his tonsils; that about the hour of 11:30 o'clock A. M., on September 8, 1928, she and her child accompanied her husband to defendant's sanatorium; her husband went in and remained about fifteen minutes; that he returned and they went from there to the house of her father, M. L. Showen, where they remained about two hours and then her husband and her father went to the sanatorium; after that, she never saw her husband alive, she saw him the next morning and he was dead.

The institution of defendant is located near Macon, Missouri, and is referred to and is known as the Still-Hildreth Sanatorium, Dr. Hildreth, president and superintendent of the sanatorium, called by plaintiff, testified that plaintiff's Exhibit B was a correct letterhead of the institution. It bears the following:

"Dr. Arthur G. Hildreth, President and Superintendent.
"Dr. Harry M. Still, Associate Physician.
"Dr. Charles E. Still, Associate Physician.
"Dr. Geo. M. Laughlin, Consulting Surgeon.
"Dr. Herman P. Hoyle, Senior Staff Physician.
"Dr. J. Conway Snyder, Staff Physician.
"Dr. Fred M. Still, Staff Physician.
"Dr. Joseph E. Risser, Staff Physician.
"Dr. R. J. McReynolds, Staff Physician.
"Dr. Richard Still, Staff Physician.
"Dr. James W. Day, Laboratorian.
"Still-Hildreth Osteopathic Sanatorium,
"Macon, Missouri."

He further testified, upon examination by defendant's counsel, that the sanatorium was maintained and conducted solely for the purpose of treating nervous and mental diseases; that surgery was not employed; that surgical cases were not admitted; that patients were treated by its staff of physicians consisting of osteopaths; that no M.D.'s nor graduates of medical schools were employed; and further, on redirect, that an osteopath is required to be examined in everything except internal medication and that since 1903, all osteopaths are examined in surgery as well as other subjects. The Sanatorium compiled and issued statistical reports, one of which, plaintiff's Exhibit C, covering the period from March, 1914, to March, 1920, shows the total number of patients who were nonmental and those coming for examination, opinion, and advice to be 448. This witness testified that that number were more or less nervous cases

and none were surgical cases. The report covering the period from March, 1914, to March, 1929, introduced as plaintiff's Exhibit D, contains the following:

"Statistical purposes (excluding some organic diseases), cases other than nervous or mental and those coming for examination, opinion and advice ................... 1737
And further shows these items:
"Cases other than nervous or mental ................. 100
"Organic diseases .................................. 395
"For examination, opinion and advice ................ 1148"

The witness testified that the one hundred cases listed under the head of cases other than nervous or mental were non-surgical cases.

The Article of Association of defendant company introduced in evidence show, among other things, the purposes of the organization. "To found, establish, operate and maintain near the city of Macon, in the county of Macon and State of Missouri, a Sanatorium and Hospital and an institution for scientific research for the practice, instruction and treatment of the mental bodily diseases of humanity according to the methods and practice of osteopathy . . .; to assist, enlarge, develop and promulgate scientific learning as applied to the theory and practice of the science of osteopathy for the cure of mental and bodily afflictions; and to do any and all things in connection with the operation, management, development and instruction of a complete, thorough, modern and scientific Sanatorium Hospital, school and an institution for scientific research as applied to the scientific development and practice of Osteopathy."

Raymie Gilstrap worked under the supervision of Edwin L. Jury, Mr. Jury desired to visit a friend of his then in defendant's sanatorium and in company with Raymie Gilstrap went to the sanatorium September 6, 1928; he testified that during that visit and in the presence of Dr. McReynolds in said sanatorium, Gilstrap said, "This is the doctor that is going to remove my tonsils." The witness testified that Dr. McReynolds in reply merely added his O. K. to it and requested Gilstrap to come to the sanatorium on Saturday instead of Sunday; he was to have come on Sunday, but Dr. McReynolds told him to come Saturday afternoon at four o'clock instead of Sunday and *to come prepared to stay a day or two*. This occurred in the reception room of the sanatorium and the doctor requested Gilstrap to come to the sanatorium; that he had another case and would take care of him after the other patient; that he told him to come to the sanatorium *and be prepared to stay a day or two*, and that the doctor got permission of the witness for Gilstrap to have that time off.

Dr. Petermyer testified that he was the house physician and surgeon of the Kirksville College of Osteopathy & Surgery; that about six or six-thirty o'clock, September 8, 1928, Dr. McReynolds asked

him if he could operate in their hospital before the next morning and was given permission so to do; that Mr. Gilstrap was brought into their hospital, subjected to anaesthetic and removed to the operating room about six-twenty o'clock. He did not see the patient until he was brought to the anaesthetic room; he began the administration of the anaesthetic himself and then turned him over to the regular anesthetist, Dr. Brown; no examination was made of his throat; no history of the case was obtained from Dr. McReynolds; the operation was begun by Dr. McReynolds about seven o'clock. Those present were Dr. Risser, Dr. Brown, Miss Robison, Miss Parmalee, Miss Bently and Dwight Andrews, an interne. Dr. Petermyer then retired and about forty or forty-five minutes thereafter returned to the operating room and discovered that the patient was still on the operating table, and discovered that he had a weak and rapid pulse; that was reported to Dr. McReynolds who said that he was about thru; the tonsils had been removed and there was considerable hemorrhage, "constant welling up of blood;" Dr. McReynolds had been trying to stop it with a sponge and asked the advice of Dr. Petermyer who advised suturing. Dr. McReynolds said he had never done any of that and didn't care to do it and asked Dr. Petermyer to do it. Dr. Petermyer proceeded to suture the wound in the throat which stopped the hemorrhage. Shortly thereafter and about eight o'clock the patient was removed from the operating room to his own room in this hospital and at that time he was cyanotic; at the hunger type of respiration, gasping for air, his pulse at that time could not be obtained at the wrist; that when this witness discovered the weak and rapid pulse in the operating room, it indicated one of two conditions—either hemorrhage or surgical shock. The surgeon, Dr. McReynolds, said he was nearly thru and after operating perhaps ten minutes longer, he said the patient was ready to be taken back to the room. Witness had had no consultation with the patient, but was just helping out. The suturing done by Dr. Petermyer stopped the hemorrhage, but in his opinion it "was done too late to do any good although it was necessary that it be sutured if there was any chance of life." He further testified that Dr. McReynolds in performing the operation used two methods known as the Sluder method and also the snare. The tonsils were snared off or cut off by a blunt cutting instrument. He *noticed obstructed respiration before the patient went to the operating room;* after the patient returned from the operating room he was blue, unconscious, and at the hunger type of respiration; a glucose solution was injected under the skin to put the blood in circulation and thereafter, adrenalin was given by the nurse; Dr. McReynolds had complete charge of the patient; adrenalin increases blood pressure, maintains heart action; there was necessity for additional blood pressure because it was impossible

to get the pulse and because there was a lack of circulation; shortly after nine o'clock the patient died. This witness says the death was due to shock and hemorrhage; that the main cause of shock is perhaps trauma, due to the conveying of traumatic impulses to the brain and it causes paralysis of the vasomotor system; *that bleeding increases the severity of the shock*. When asked if he noticed anything about the operation that caused an excessive shock from trauma, he replied: ''Only the length perhaps, of the operation.'' That the ordinary length of time of a tonsil operation is about twenty minutes; that would be considered the ordinary time. Etherization did not cause his death which was due to shock and hemorrhage —one or both. Witness had never had an operation of tonsillectomy that resulted in death.

Witness referred to as Dr. Brown testified that he assisted in administering the ether to Raymie Gilstrap that he came down about six-thirty and the man was on the anaesthetic table. Dr. Petermyer had started the anaesthetic and it was then turned over to him; he continued administering ether for about twenty or thirty minutes before it was completed; the patient was then taken to the operating room; the parties present were Dr. McReynolds and Dr. Risser, Miss Parmalee and Miss Robison; she came with the doctors; he didn't pay much attention to the operation; it was his job to watch the anesthesia. He noticed that the patient's heart was getting weaker and notified Dr. McReynolds who said he would soon be thru; Dr. Risser was standing on the other side of the patient using the aspirator and assisted by holding the instruments; Miss Parmalee was at the surgical table; Miss Robinson was at the side and back; Dr. Petermyer came in and sutured the operation; he saw nothing alarming about the man's condition except the flow of blood; Dr. Petermyer was called in on account of this.

Miss Parmalee testified she first saw the patient on the operating table; Dr. McReynolds used the Sluder snare, tonsil forceps and dissecting tools, scissors or knife—and then the regular clinical snare; Dr. Risser was assisting; witness was assisting doctor, and another nurse came with the case; Dr. Petermyer came in, took the patient's pulse and reported it to the doctor; it was weak and he reported the pulse rate to the doctor; very near the end of the operation Dr. McReynolds requested Dr. Petermyer to look into the patient's throat and Dr. Petermyer sutured the wound there to prevent hemorrhage; that was very near the end of the operation; there were no tests made of any kind, to her knowledge. The clinical report of this hospital shows:

Miss Robinson, Special nurse.

Sept. 8, 1928, Mr. Raymie Gilstrap.

Doctor McReynolds-Risser.

6:20 to Surgery.

8:00 from Surgery. Unable to get pulse; Cyanotic, Hypodermoclysis Glucose 5% by Dr. Petermyer.

Hypo. Adrenalin.

8:50 Dr. Petermyer, Articificial respiration by Dr. McReynolds.

9:05 Expired.

M. L. Showen testified that he is the father of plaintiff; that on the 8th day of September he accompanied Raymie Gilstrap to the Still-Hildreth Sanatorium, south of Macon, and arrived there about 2:30, and entered the sanatorium of defendant; they were met by an attendant in uniform who took them to seats in the lobby and Mr. Gilstrap told him that he wanted to see Dr. Mc-Reynolds. Dr. McReynolds came and told Gilstrap that he was busy at the time and that he would have to wait about half an hour, and left. Witness and Gilstrap remained in the reception room; later, an attendant came and inquired if they did not desire to go out on the campus, that the doctor could not do the work for a while; they would have to wait awhile longer. This was half an hour afterwards. The man was an attendant at the sanatorium. They waited longer and this man came back again and asked if they didn't want to go out to the ball game. Dr. McReynolds came back shortly after that and someone was with him unknown to the witness. Gilstrap said he couldn't wait any longer and that if he couldn't do the work he was going back home, and the doctor said he was waiting *for the head nurse to give an injection and local anaesthetic,* and he hurried around and got her and we went up stairs. The head nurse was Miss Robinson who came back with the doctor in about ten minutes. We went upstairs on the next floor into a room and the nurse gave Gilstrap an injection in the right arm. Dr. McReynolds was there together with a young man who had on a uniform. Previous to that, the young man was getting the doctor's instruments sterilized and ready; he had the instruments there where the operation was undergone. He said he had sterilized the instruments and got them ready; he handed them to the doctor when the operation was taking place; the injection in the arm didn't seem to have any effect; after it was received they. told us to go down below and wait a few minutes on the first floor where we went in, until it had taken effect; there were several people around there; he knew only one, Mr. Brown. Dr. McReynolds and this attendant came around after awhile, in about twenty minutes; the doctor told us to go into the room where the operation was undergone; it was a different room to the one we had been in before; there were some chairs in the room and a lot of surgical instruments lying out on a table; the doctor injected something into the patient's tonsils, or tried to, while Gilstrap was sitting in the chair. The doctor stuck his needle into his throat and it looked like to me he stuck it plenty down; he complained of it going down in his throat; he injected something

in there, then the doctor undertook to put a snare around the tonsil and Raymie complained; he didn't get it clear on; he got it pretty well on, but Raymie Gilstrap complained of its being painful and he couldn't breathe and that whatever it was injected went down his throat. The doctor quit and injected some more in there; he stuck the needle in there like he did before; it looked to me like he stuck it in there about two inches or a little more and Raymie complained that it went down his throat all the time; didn't have no effect on deadening the pain; he waited a few minutes; the persons then present were myself, Gilstrap, the doctor and the attendant. The doctor tried again to use that snare and Raymie told him he couldn't stand it; he tried to put it around the tonsil again; he tried about five minutes; Raymie said he just couldn't stand it, it was too painful. Then Dr. McReynolds suggested that they go to Kirksville and have the operation done under a general anaesthetic. They decided then that they would go to Kirksville and we then went across the lobby or hallway to the doctor's bedroom and he asked if he didn't want to lie down awhile; a couple of other doctors roomed there; one of them was Dr. Still. Dr. McReynolds introduced the witness and patient to Dr. Still. Gilstrap lay down on the bed for about fifteen minutes; he got up and said he felt pretty good. Witness was to go to Kirksville on Monday to get him. Dr. McReynolds said that he had better stay over until Monday before he came home. Witness left the sanatorium a few minutes after four o'clock. In reference to the talk about going to Kirksville, witness further testified on cross-examination that Dr. McReynolds suggested they go to Kirksville, and that it would be advisable for him to take a general anaesthetic and to take him to the hospital at Kirksville. He said he would pay for one night up there; that Dr. McReynolds said he would pay $5 out of his own pocket for his room at Kirksville; Mr. Gilstrap agreed to that.

Dr. Miller testified that he is a resident of Macon, a physician and surgeon engaged in general practice and surgery as a medical doctor; that the operation of tonsillectomy is a simple procedure; that the examination required before such an operation was the matter of coagulation of the blood, condition of the heart, and local examination of the tonsils. Ordinarily, coagulation takes place in three to five minutes; it runs up to ten and fifteen minutes and in rare cases, it does not coagulate at all. Where it runs up to ten minutes it is usually advisable to build up the coagulation before the operation; if coagulation time is increased there will be more bleeding, and the longer the coagulation time the more bleeding a person will get, ordinarily. In seeking this, the object is to prevent hemorrhage and loss of blood. The heart examination involves the question of choice of anaesthetics. If the patient had a bad

heart, he would rule against giving ether or gas and use a local anaesthetic. "We are very much more particular in regard to men patients than we are to ladies because of the fact that we are more apt to find bleeding among men than we are among women." That it would be improper to attempt to operate without taking the coagulation test; that an attempt to give a local anaesthetic by inserting a hypo needle in the throat twice in the course of half an hour and in an attempt to cover the tonsil twice with a snare during that period while the patient suffered pain, would inflame the tonsils and the tissues of the throat; such an attempt would cause some destruction of the tonsillary tissue, and it would be impossible to draw a snare or any other instrument over the tonsil without causing some destruction of the tonsillary tissue. In answer to the question as to whether it would be proper to operate on a patient who had had a hypo in the arm and two local anaesthetics and two attempts with a snare to have his tonsils removed, which were unsuccessful, leaving the tonsils swollen and inflamed, taking the patient in a car to Kirksville, thirty-two miles, and immediately, without any examination of the coagulation time or of his condition, place him under ether and twenty or thirty minutes thereafter the operation of tonsillectomy was gone thru, witness answered, "That would not be proper procedure in my opinion." That fifteen minutes would be ample time to remove two tonsils, and that one hour would be unreasonable; that a physician, while an aspirator is being used and a hemorrhage occurs in a man's throat, would be able to discover it at any time; that his duty would be to stop the hemorrhage; Cyanotic condition means that the person gets blue due to the lack of oxygen in the blood; that when such a condition occurs in an operation for tonsillectomy, it is an indication of one of two things— it indicates too much hemorrhage or too much ether, radial pulse is obtained at the wrist. Where the operation has consumed forty-five to fifty minutes and the radial pulse becomes weak and finally diminishes to to a point where it cannot be detected at all, that would indicate failing circulation due to hemorrhage. When asked if he was acquainted with the osteopathic method of surgery, he answered, "There is only one way to take out tonsils." That, "There is really only a very simple procedure necessary in tonsillectomy."

Defendant called as a witness, Bryan Hurst, secretary of defendant sanatorium. He testified that defendant sanatorium was located about a mile and a half south of Macon; that their buildings consisted of about 200 rooms; that he takes care of matters pertaining to expenses, the financial end of it; that he interviews each patient or the relatives of each patient that is brought there, and testified to the manner in which patients were received; that they are met at the door by the door boy who escorts them to the re-

ception room; there are two or three reception rooms; then the door boy notifies the matron and they are taken into the doctor's office and he takes a case history and then the relatives are shown over the building. The case history is taken in writing by the doctor and later transcribed by his secretary; a room is selected; they are brought into the office and witness takes down the name of the patient and the name of the party to whom he looks for payment; that there is a loose leaf ledger kept in which each patient has a sheet. Raymie Gilstrap was never entered as a patient in the institution. Dr. McReynolds was a member of the staff of physicians whose duty was to treat osteopathically. Dr. Hildreth employed him; he was paid a salary for his services and furnished a room; that defendant had no surgical operating room and no surgical instruments to remove tonsils; that defendant never has patients for surgery; that it has no connection with any surgical hospital. Dr. McReynolds was not discharged, he left the institution about the first of October, 1928; if the doctor treated one or 150 patients his salary was the same; the doctors in the institution had surgical instruments; they may have used them, witness did not know; that he made a record of every patient and there was no record for Raymie Gilstrap; witness further said he didn't always know about the condition of the patients, "I am not associated with the case histories and the records."

Miss Annette Moore testified for defendant that she was secretary to Dr. Hildreth and kept all the records of the institution and there was no record of Raymie Gilstrap. She made up her record from information furnished her. She has a complete record of what is handed to her. Samples of records of patients were identified and introduced in evidence.

Charles Wisenborn was called by defendant and testified that he was business manager of the Macon Republican, a former Macon publication, and identified an advertisement of Dr. Risser and Dr. McReynolds published in said paper August 28, August 31 and September 4, 1928. The publication was as follows:

ANNOUNCEMENT

DR. J. E. REISER
Osteopathic Physician
and Surgeon
General Practice.
Office Hours—9-11 A. M.
1-4 P. M.      6-7 P. M.

DR. M. E. REISER
Osteopathic Physician
Women's and Children's
Condition
325½ N. Rollins St.
Macon, Mo.

DR. R. J. McREYNOLDS
Associated with Drs. Reiser—Specializing in
EYE, EAR, NOSE AND THROAT
Appointment Made with Dr. Reiser.

## OPINION.

Should the demurrer have been sustained? In the consideration of this question, it has become axiomatic in the law that plaintiff's evidence shall be considered as true and defendant's evidence, which is contrary to it, shall be rejected; and that plaintiff is entitled to the benefit of all reasonable inferences which may be drawn from all the evidence of both plaintiff and defendant.

Appellant insists that there was no evidence upon which to submit to the jury the question of defendant's liability for the acts of Dr. McReynolds in treating plaintiff's husband; that he was not defendant's agent, but was acting in his own behalf. In view of all the facts and circumstances in this case, we are satisfied that appellant's contention cannot be sustained. It is admitted, and shown in evidence, that the defendant corporation owned and operated a large sanatorium for the treatment of human ailments and afflictions; that it maintained a large staff of physicians or executive officers; that among them were Dr. McReynolds and Dr. Geo. M. Laughlin, consulting surgeon; that Dr. McReynolds, in addition to a salary paid by defendant, was given his room and board in said sanatorium and that he lived there, and that he got the same pay for his services whether he treated 1 or 150 patients; that the solemnly declared object and purpose of the corporation, among other things, was to treat all human ailments and afflictions; that defendant did receive large numbers for examination, opinion and advice, other than nervous and mental patients. It is a fair inference from the evidence that Raymie Gilstrap had gone to this institution prior to the 6th day of September, 1928, and had been in consultation with someone there, because it is shown that on this day he and Dr. McReynolds, in the presence of a witness, agreed that Dr. McReynolds was to remove his tonsils, and at that time Dr. McReynolds directed him to come to defendant's sanatorium, at a stated time, prepared to stay a day or two. There is no evidence that the deceased knew that defendant claimed it treated only nervous or mental diseases and defendant is not entitled to any inferences of that kind. The only reasonable and proper inference that may be drawn is that the deceased understood and believed that he was entering defendant's sanatorium as its patient to be treated by its physicians and surgeons and when he entered the sanatorium the relation of physician and patient was created between him and the defendant. The relation, once established, continued unless changed by mutual consent, or unless reasonable notice was given, or ended by his dismissal. [Noren v. American School of Osteopathy, 2 S. W. (2d) 215, 220.] From the foregoing case, we quote the following pertinent expression:

"There is in general no particular mode in which an agency can be established; and it is immaterial what terms are used by the parties, or by what name the transaction is designated, if the requisite ele-

ments of such status are otherwise deducible from the facts taken as a whole.

"Furthermore a relation of agency does not depend in every event upon an express appointment and acceptance thereof, but, to the contrary, it may be, and frequently is, implied from the conduct and words of the parties, and from the several circumstances of the particular case when given a natural and reasonable construction."

Appellant, to maintain its position, argues that from the fact shown in evidence that Dr. McReynolds advertised himself as specializing, giving a certain office address with Drs. Reiser outside of the sanatorium, that defendant is entitled to the inference that Dr. McReynolds was acting upon his own account, and not in behalf of the defendant, when plaintiff's husband was received into the sanatorium. The jury rejected such inference, and defendant is not entitled to the benefit of any inferences favorable to it, when it comes to the question of passing upon a demurrer to plaintiff's case, but all such inferences, if any, will be rejected. Further, we think that a reasonable inference may be drawn in behalf of plaintiff in this case that her husband was in fact the patient of defendant, instead of the personal patient of Dr. McReynolds, from the very fact that he was received at defendant's sanatorium and instructed to come prepared to stay a day or two at the sanatorium, and was received and treated at the sanatorium by the agents and employees of defendant, acting at least within the apparent scope of their authority. If in fact he had been the personal patient of Dr. McReynolds, in pursuance to the published notice by him as a specialist, and that appointments be made with Dr. Reiser at $325\frac{1}{2}$ N. Rollins Street, Macon, Missouri, it may be inferred that he and the doctor would have been found at that place instead of at the defendant's sanatorium. A further inference may be drawn in plaintiff's behalf from the fact that on defendant's staff of physicians was included the name of Dr. George M. Laughlin, consulting surgeon, and that he could have been reasonably led to believe, and did believe, that defendant undertook to and did perform surgery. So far as the evidence shows, Dr. McReynolds was acting at all times within the apparent scope of his authority as a staff physician, and so far as the patient knew, he certainly had implied authority to do what he undertook, that is, to receive the patient and to treat him as the patient of defendant. There certainly is no evidence of any knowledge on the part of the patient of any limitation upon the authority of Dr. McReynolds to so receive and treat him as a patient of the defendant. Wherever an agent acts within the apparent scope of his authority, the principal is bound if the party dealing with the agent acts in good faith. [Bank v. Ins. Co., 145 Mo. 127, 138.] From the time the patient entered defendant's sanatorium, he was in the complete charge and control of defendant's employees

and agents, consisting of Dr. McReynolds, the head nurse, the Doctor and a Dr. Reiser took the patient to a neighboring hospital for a general anaesthetic and had complete charge of his case until his death. There was not only sufficient but ample evidence from which the jury could find, and reasonably infer, that Dr. McReynolds was at all times acting as the agent of the defendant, and within the scope of his authority, and that the relation of physician and patient existed between Gilstrap and the defendant. The fact that the final operation was performed elsewhere than at the sanatorium of defendant is of no consequence, if the relation of patient and physician existed, and continued to exist thruout his treatment. It was competent and proper for the jury to pass upon the question as to whether Dr. McReynolds was the agent of the defendant, and it so found.

The other angle of attack, upon the ruling of the court on the demurrer, is that there was no proof of negligence on the part of Dr. McReynolds, and no proof of malpractice, for which defendant would be responsible. Sufficient proof was made. The operation upon the patient was continued an unreasonable length of time—four times as long as would reasonably be required; dangerous hemorrhage was produced during the operation; the doctor in charge either failed to discover it or failed to stop the hemorrhage; and when advised by another doctor, about forty-five minutes after the beginning of the operation, that the wound should be sutured in order to stop the hemorrhage, he declined to do it himself, but requested the other doctor to do it; that at the time the wound was sutured it was too late to save the patient's life on account of the loss of blood, and th unreasonable length of time of the operation. These, with other facts and circumstances in evidence, show that the treatment and operation upon the patient was not only improper and ill-advised, but was a complete and tragic bungle from its inception to its end. This presents a patent case of a doctor subjecting a patient to improper treatment, and allowing the patient to bleed to death, when in the exercise of ordinary skill it could have been prevented.

But appellant further says that there was no causal connection established between the alleged negligence and the death of the patient. There is nothing in this case upon which the jury could have reasonably concluded that the death of the patient was due to any other cause than the negligent and improper treatment which he received, and no expert testimony upon this subject was necessary. [Sontag v. Ude, 191 Mo. App. 617, 625.] As stated in this opinion:

"Whether these were acts of negligence, was for the jury. Whether these acts were the proximate cause of death was within the competency and intelligence of the jury to determine. No professional —no opinion—evidence was necessary, so far as plaintiff's case was concerned. If these matters were not the cause, if defendant's con-

duct was that of a reasonably skillful surgeon and physician, it was for him to have put in his proof.''

There was no attempt on the part of defendant to justify or excuse the methods adopted by defendant's doctor, as reasonably proper, or to show that the effect of the careless operation was not the cause of death, or that said death could not have been prevented by the use of ordinary skill. For the jury to find, or for us to hold, that defendant, as the doctor of this patient, did use reasonable care and skill, would be to profane the noble and humane profession of the healing art. Defendant employed and harbored an incompetent doctor in its sanatorium, and held him out to the public as safe and fit for all functions apparently intrusted to him, and should not be permitted to escape the consequences of his incapacity. If it could escape on the mere assertion that the doctor was not its agent, which assertion the jury did not believe, then the defendant, without responsibility, could entrap the innocent and unwary. We think the demurrer was properly overruled and the case submitted to the jury for its judgment of the facts, and inferences which it might reasonably draw therefrom, upon the questions of agency, malpractice and causal connection. [McDonough v. Freund, 19 S. W. (2d) 285; Owens v. McCleary, 313 Mo. 213; Eichholz v. Poe, 217 S. W. 282; Noren v. American School of Osteopathy, supra.]

The assignments of error contain the charge that the court erred in giving plaintiff's instruction No. 1, and erred in admitting in evidence the Articles of Agreement of defendant. These two assignments are not pursued or developed anywhere in the brief and no reason is given in these assignments for the error charged. They are abandoned.

Appellant makes two other assignments, (1) that the court erred in overruling objections to the questions propounded to the expert witness, Dr. Miller, and (2) the court erred in admitting in evidence the declarations of Dr. McReynolds. In reference to the declarations of Dr. McReynolds, the same point is made under ''points and authorities'' in the brief, but there is no reference made to the evidence of any particular statement to which appellant objects, and no showing as to why any such statement was improperly received. Appellant should have pointed out the particular evidence to which it objected and the reason, if any, why it was improperly admitted, if it desired to urge the point on appeal. We are justified in passing this assignment for this reason, as well as for other reasons stated hereafter.

The assignment in reference to the testimony of Dr. Miller is in the general words indicated above, and is wholly insufficient to indicate what particular questions were objectionable, or what particular ruling of the court was erroneous. This assignment is not pursued under points and authorities and no authority cited therein

to sustain said assignment, but appellant refers to it in its argument and refers to certain pages of the abstract, in which a part of the examination of the doctor is shown, and argues that the testimony was erroneously received. Waiving the point as to whether or not appellant has properly assigned the error in this respect, and passing that question without decision and giving appellant the benefit of the doubt, we still find upon a close examination of the abstract that the matters about which complaint is made, in some instances were not objected to at all, and in other instances the objection urged was not sufficient or was not the same objection urged upon appeal. We further observe that in some instances the objections on the trial to questions propounded to Dr. Miller were insufficient for failure to specifically point out to the court what matters in the questions propounded were assumed, or what matters in evidence were omitted. And we further find that the specific objection urged on appeal to the testimony of Dr. Miller is not the same objection made to the trial court, but an entirely different one. The main objection to the trial court was that the questions were not based on the facts in the case, or that facts stated in the questions were assumed; while on appeal it is mainly urged that the questions to Dr. Miller were not in proper form because they failed "to limit the inquiry to what the ordinary physician would ordinarily do under similar circumstances." Appellant is not in position to be heard upon this assignment. The trial court cannot be convicted of error in that way. [Scheipers v. Missouri Pacific R. R. Co., 298 S. W. (Mo. Sup.) 51, 54.]

We have taken the pains to search the abstract, and have read every page of it, and find that while appellant, at the trial, objected to certain questions propounded to the different witnesses, there is no exception to the ruling of the court written in the bill of exceptions. But we further find this situation: At the commencement of the trial the court announced that "All exceptions are saved in this case." And at another time when plaintiff's counsel requested an exception, the court stated: "The rule is that all exceptions are saved to all adverse rulings." Another counsel inquired: "That is the permanent rule of the court, isn't it? And the court replied: "I have so indicated many times."

The question is, whether appellant has any exceptions saved to the ruling upon the admission of testimony. We think it has no exception preserved in the bill. Section 1459, Revised Statutes 1919, provides that whenever either party shall except to the opinion of the court, "he shall write his exception and pray the court to allow and sign the same." No rule of court could dispense with the necessity of doing this, but a rule of court which is not in conflict with this section may be adopted and used as a matter of convenience in the trial process. The mere statement of the trial court that exceptions are saved, and that is the rule of court, does not relieve

appellant of the necessity of writing in the bill of exceptions the exception which he desires to have preserved. [Green v. Railroad, 211 Mo. 18; State ex rel. v. Miller (Mo. Sup.), 241 S. W. 920, 922; Tyon v. Wabash Railroad Co., 207 Mo. App. 322, 334; Noren v. American School of Osteopathy, 2 S. W. (2d) 215, 218; Straub v. Laclede Gaslight Co., 287 S. W. 1061, 1062.] The assignment and attempted assignment of error in reference to the admission of testimony must be overruled in any event, and upon the ground that appellant did not preserve any exception to the ruling of the court thereon.

No material error affecting the rights of defendant has been shown. The verdict was for a moderate amount, the judgment appears to be for the right party and should be affirmed. The commissioner so recommends. *Barnett, C.,* concurs.

PER CURIAM:—The foregoing opinion by BOYER, C., is hereby adopted as the opinion of the court. The judgment is affirmed. All concur, except *Trimble, P. J.,* absent.