**Mickey PORTER, Appellant,**

v.

**SISTERS OF ST. MARY d/b/a St. Joseph Hospital, Appellee.**

No. 84–1140.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 12, 1984.

Decided March 7, 1985.

Rehearing Denied April 8, 1985.

James Hullverson, Jr., St. Louis, Mo., for appellant.

Kenneth C. Brostrom, St. Louis, Mo., for appellee.

Before ARNOLD, Circuit Judge, HENLEY, Senior Circuit Judge, and JOHN R. GIBSON, Circuit Judge.

JOHN R. GIBSON, Circuit Judge.

Mickey Porter appeals an order of the district court[1] granting St. Joseph Hospi-

---

1. The Honorable Stephen N. Limbaugh, United States District Judge for the Eastern and West- ern Districts of Missouri.

tal's motion for judgment notwithstanding the verdict. Porter, who suffered toxic shock syndrome following surgery intended to prevent future collapse of his lung, obtained verdicts of $3,000,000 against Dr. T.A. Schneider, the surgeon and attending physician, and $1,500,000 against St. Joseph Hospital. The district court ruled that Porter had failed to show that the hospital expressly ordered or directed the acts of Dr. Schneider and, therefore, had failed to make a submissible case against the hospital. Porter urges this was error, arguing that his evidence established a case of ostensible agency. We conclude there was no such showing, and affirm the judgment of the district court.

On April 11, 1981, Mickey Porter went to the emergency room of St. Joseph Hospital in St. Charles, Missouri, suspecting, because of previous experiences, that he had a collapsed lung. He was twenty-two at the time, and had just moved to the area a few days earlier from Illinois. He was admitted to the hospital. A doctor in the emergency room, who was an employee of the hospital, told Porter that his lung indeed had collapsed but that he would not treat it himself since "we called Dr. Schneider and he's our best person for the job." Dr. Schneider arrived and inserted a tube in Porter's chest to allow the lung to inflate and expand.

Dr. Schneider also told Porter on April 11 that he should consider having surgery done so that his lung would not collapse again. Porter's former doctor had also told him surgery would be necessary if he had another collapse. The two talked further on April 12. Dr. Schneider told Porter he could perform the surgery in St. Charles or that Porter could return to Illinois and have the operation there. Porter was not sure what he wanted to do, talked with friends about it, and finally decided on April 13 to have Dr. Schneider perform the surgery. On April 14 Dr. Schneider performed the surgery which eventually led to Porter's serious medical problems.

Porter sued both Dr. Schneider and St. Joseph Hospital. At trial, Porter withdrew his claim of primary negligence against the hospital, proceeding against it only on the theory that Dr. Schneider was its agent. In its order, the district court comprehensively summarized the evidence concerning the relationship between Dr. Schneider and the hospital that bears on that theory:

[Dr. Schneider], a surgeon, is on the medical staff of * * * [the] hospital. Ostensibly, he was granted surgical staff privileges following the hospital's routine credentials committee investigation and had enjoyed staff privileges for many years. He is also the director of the hospital's trauma center. The doctor testified he was not a paid employee of the hospital and was and is an independent contractor. Plaintiff testified no one at the hospital told him Dr. Schneider was an employee of the hospital, but when someone who talked with plaintiff suggested calling Dr. Schneider, saying, "He's our best man", plaintiff assumed the doctor was an employee of the hospital.

* * * [Dr. Schneider] bills his surgical patients from his professional office, located away from the hospital. He does not receive any remuneration direct from the hospital, but does utilize hospital facilities for his surgical patients. He has no office at the hospital. The doctor as a member of the medical staff of the hospital conducts his practice in accordance with hospital regulations as to procedures and housekeeping. In the course of his diagnostic investigations, treatment and follow-up, he utilizes his own expertise as a surgeon and makes all decisions as to the course of medical treatment for his patients, taking the patient's wishes into consideration, as well as the patient's authorization for treatment. The hospital does not supervise, direct or control the doctor's medical treatment of patients. The consent for treatment of plaintiff by Dr. Schneider was a part of the consent forms obtained from plaintiff routinely by hospital personnel.

* * * The members of * * * [the] hospital nursing staff have identification

badges and generally dressed similarly pursuant to a hospital dress code. The badges show the name of the hospital and the nurse's name, number and picture. There is no uniformity of testimony that shows distinctions or similarity in dress and identification between medical staff physicians and hospital employed physicians. Some doctors are in scrub suits, some in white jackets and others wear dress suits. Some doctors wear badges and others do not. * * * Schneider denied wearing an identification badge.

* * * There is no evidence to show that Dr. Schneider was an employee of St. Joseph's Hospital or that a principal-agent or master-servant relationship existed which would prove Dr. Schneider was treating plaintiff within the scope and course of a defined agency.

*Porter v. Schneider,* No. 82–2113C(5), slip op. at 2–3 (E.D.Mo. Dec. 23, 1983).

The jury returned verdicts of $3,000,000 against Dr. Schneider and $1,500,000 against the hospital. Upon Porter's agreement to remit damages awarded him against Dr. Schneider in excess of $2,000,000, the district court entered judgment on the verdict against the doctor. The district court also granted St. Joseph Hospital's motion for judgment notwithstanding the verdict. Dr. Schneider and Porter both appealed, but the appeal of Dr. Schneider was dismissed before argument. Porter argues on appeal that the district court erred in its grant of j.n.o.v. because he presented sufficient evidence of ostensible agency to make the hospital liable.

The parties are in agreement that in this diversity case the law of Missouri applies. In so applying Missouri law, the district court granted j.n.o.v. for the hospital on Porter's vicarious liability claim, reasoning that for Porter "to make a submissible case here, he must show that St. Joseph expressly ordered or directed those acts of

Dr. Schneider which a jury might have found were negligent or wrongful. This he has failed to do." *Porter,* slip op. at 7. The court cited as authority for this standard *Burns v. Owens,* 459 S.W.2d 303 (Mo. 1970), *Campbell v. Preston,* 379 S.W.2d 557 (Mo.1964), and *Restatement (Second) of Agency* § 267 (1958). Initially, we consider Porter's assertion that this is the wrong legal standard to apply to his claim that the hospital held out Dr. Schneider as its agent to him and, therefore, should be vicariously liable.

Porter, of course, claims only vicarious, not direct, liability on the part of the hospital. Thus, his reliance on the statement in *Gridley v. Johnson,* 476 S.W.2d 475, 484 (Mo.1972), that "[t]he fact the defendant doctors here were not employees of the defendant hospital does not necessarily mean the hospital cannot be held for adverse effects of treatment or surgery approved by the doctors," is misplaced. *Gridley,* which cites as authority for its position the landmark case of *Darling v. Charleston Community Memorial Hospital,* 33 Ill.2d 326, 211 N.E.2d 253 (1965), *cert. denied,* 383 U.S. 946, 86 S.Ct. 1204, 16 L.Ed.2d 209 (1966), speaks to the *direct* duty of a hospital to monitor, supervise and regulate its medical staff. *See* Bartimus, Kavanaugh & Sullivan, *Protecting Plaintiff's Rights in the Medical Malpractice "Crisis,"* 53 UMKC L.Rev. 27, 43 (1984). Porter makes no such claim of direct liability here.

Porter grounds his claim of vicarious liability on *Restatement (Second) of Agency* § 267 and the theory of ostensible agency, a type of agency created by apparent authority.[2] He argues that this theory does not require the express ordering or direction of acts by the principal. As he points out, in *Gilstrap v. Osteopathic Sanatorium Co.,* 224 Mo.App. 798, 24 S.W.2d 249 (1929), the theory, though not specifi-

---

**2.** *Restatement (Second) of Agency* § 267 provides:

One who represents that another is his servant or other agent and thereby causes a third person justifiably to rely upon the care or

skill of such apparent agent is subject to liability to the third person for harm caused by the lack of care or skill of the one appearing to be a servant or other agent as if he were such.

cally labeled as such, was evidently applied where the sanatorium was not permitted to "escape on the mere assertion that the doctor was not its agent," since it "held him [the doctor] out to the public as safe and fit for all functions apparently intrusted to him," *id.* 24 S.W.2d at 257, and since the patient, on the facts of the case, "understood and believed that he was entering defendant's sanatorium as its patient to be treated by its physicians and surgeons."[3] *Id.* at 256. St. Joseph, however, argues that *Burns v. Owens*, 459 S.W.2d 303 (Mo. 1970), not *Gilstrap*, is controlling precedent. Porter vigorously disagrees. Oddly enough, it seems that no other Missouri case has squarely addressed the issue of apparent authority in medical malpractice cases, so the proper legal standard does depend on whether *Burns* applies.

In *Burns*, a Dr. Owens, after performing minor surgery on his patient, left orders in the hospital record authorizing intramuscular injection of demerol for pain. When the patient requested relief for his pain, a nurse improperly injected the demerol, paralyzing the patient's arm and hand. Burns, the patient, sought to hold Dr. Owens vicariously liable for the nurse's negligence.

In discussing Burns's claim, the Missouri Supreme Court first noted the general rule that a physician is not liable for the negligence of nurses not his employees,

> unless they perform work or duties for him under his supervision and control, or unless he is negligent in permitting them to attend the patient, or unless the negligent acts were performed under conditions where, in the exercise of ordinary care, he could or should have been able to prevent their injurious effects and did not do so.

*Id.* at 305. The court next turned to two specific attempts by Burns to create liability for the doctor, noting in a short paragraph, that "[p]laintiff cites and relies on Restatement of the Law, Agency 2d, § 267,

and *Campbell v. Preston*, Mo., 379 S.W.2d 557." *Id.* It then discussed these particular citations. As to section 267, the court merely noted that:

> The part of the Restatement relied on by plaintiff pertains to liability of a person for the negligence of another when that person "represents that another is his servant or other agent and thereby causes a third person justifiably to rely upon the care or skill of such apparent agent." Assuming this rule is otherwise applicable to the factual situation of this case, there is no evidence to authorize such a finding.

*Id.* The court next turned to a discussion of plaintiff's reliance on the rule announced in *Campbell v. Preston*:

> In *Campbell v. Preston*, supra, it is stated that "Where a person actively participates as by expressly ordering or directing the act which proves to be negligent or wrongful, such person is liable to a third person damaged thereby even though the relation of employer and employee does not exist between the one who directs the act and the one who performs it." In this case Dr. Owens did not direct the act which was negligent. He authorized the injection of demerol for pain, but that was not the act claimed to have been negligent. He did not direct that it be injected in the place selected by the nurse, and there is no evidence that would authorize a finding that he knew or should have known that his instructions would not be carried out according to acceptable medical practices.

*Id.*

In *Burns*, then, the Missouri Supreme Court addressed and found wanting two different ways of reaching liability for the doctor in that case. The requirement that acts be expressly ordered or directed speaks not to apparent authority, but rather to *actual* or express authority. The rule

---

**3.** In *Gilstrap*, the sanatorium argued its instruction offering a demurrer at the close of all the evidence should have been granted because there was no proof of agency. The force of the opinion's statements regarding apparent authority is somewhat weakened in that evidence of express authority (the negligent physician lived at the sanatorium and was paid a salary by it) was also held properly admitted and sufficient to defeat the proffered instruction.

of *Campbell* is supported in that case by *Restatement (Second) of Agency* § 212 (1958), not section 267, for *Campbell* is concerned with the personal participation of the principal or master in the servant's act. Apparent authority, in contrast, is concerned with the relationship of the principal to the third party. Whether the principal expressly ordered or directed acts has nothing to do with representations made to a third party. The district court, therefore, improperly merged the rule of *Campbell* with the doctrine of apparent authority. The proper legal standard for claims of the type before us remains unresolved, for *Burns*, is, at best, inconclusive as to whether section 267 even applies in Missouri in medical malpractice cases.

We need not decide, however, whether the ambiguous statements in *Burns* or the language of the 1929 decision in *Gilstrap* requires the application of the Restatement rule, and we need not reverse on the district court's standard for apparent authority, for in this case, as in *Burns*, there simply is insufficient evidence to create a submissible case. As the district court stated, only four areas of evidence could possibly support Porter's claim:

> The only discernable evidence suggesting the hospital represented Dr. Schneider as its agent is that hospital personnel obtained plaintiff's consent for the doctor to treat plaintiff and perform surgery on him and the possibility plaintiff may have considered Dr. Schneider as an employee of the hospital because of occasional similarity of hospital personnel dress, the occasional use of name tags by personnel and the medical staff and the statement

made that "He's our (hospital's) best man."

*Porter,* slip op. at 4.

█ As to dress and ID tags, there was testimony by nurses who cared for Porter that neither manner of dress nor use of identification tags discriminated between the doctors employed by and those independently associated with St. Joseph Hospital. Porter himself testified that he never knew who was or was not a "house physician." Testimony was also elicited from him that there were no "signs" or other indications at the hospital to suggest who was or was not employed by it. While this evidence speaks to the general attire of physicians, it is hardly evidence of a "representation" by the hospital of agency—as, for example, would have been presented had Dr. Schneider been issued a tag identifying him as an employee.[4] As to the consent forms, in Missouri, if a hospital furnishes consent forms to a patient for his signature, it does not thereby assume duties that are the business of the physician. *Roberson v. Menorah Medical Center,* 588 S.W.2d 134, 138 (Mo.Ct.App.1979). The consent forms Porter signed nowhere indicate that Dr. Schneider was an agent of St. Joseph Hospital. The forms also are not evidence of representation.

Porter's claim, then, depends on his testimony that a doctor in the emergency room of St. Joseph Hospital told him that Dr. Schneider was "our best person for the job."[5] The remark itself could easily be taken, even by a layman, to refer to any physician on call at the hospital who regularly practiced there.[6] Further, the context

---

**4.** Such lack of representation is apparent, for example, from the testimony of James Lambert, who stated that Dr. Schneider had to be "called in" to the emergency room, that he was casually dressed when he arrived, and that he was dissimilar in appearance from the nurses and other men in the emergency room who wore uniforms and ID tags.

**5.** Porter also argues that a charge on the hospital's bill for the emergency room physician "was substantial evidence of employment." This, of course, would have no bearing on the theory of *apparent* authority on which he bases his ap-

peal. In any event, since the name of the physician was not identified on the bill, since there was evidence Porter was seen by a doctor other than Dr. Schneider in the emergency room, and since there was evidence Dr. Schneider billed for his services separately from the hospital, we cannot conclude that the district court erred in not listing the bill as supportive of Porter's claim.

**6.** There was conflicting testimony whether the remark was later clarified. Dr. Schneider testified that he discussed with Porter the fact that he "was the on-call surgeon for that week in the

of the remark is crucial. The emergency room physician was referring only to the emergency treatment needed for Porter's collapsed lung—not to the later elective corrective surgery. The Restatement rule requires that the third party *justifiably* be caused to rely on the representations made. Missouri's law on apparent authority, developed largely within a commercial context, is that:

> Authority is not "apparent" simply because the party claiming has acted upon his conclusions * * * [nor] simply because it looked so to him. * * * It is only where a person of ordinary prudence, * * * acting in good faith, and giving heed not only to opposing inferences but also to all restrictions * * * brought to his notice, would reasonably rely, that a case is presented within the operation of the rule.

*Jeff-Cole Quarries, Inc. v. Bell,* 454 S.W.2d 5, 13 (Mo.1970), *quoting* 1 F. Mechem, *A Treatise on the Law of Agency* § 726, at 513 (2d ed. 1914); *see also Wynn v. McMahon Ford Co.,* 414 S.W.2d 330, 336 (Mo.Ct. App.1967) (belief must be reasonable and prudent). Thus, a mere subjective assertion of reliance by a third party is not enough, for it must be judged within objective constraints. Porter's subjective conclusion that he *assumed* Dr. Schneider to be an employee of the hospital fails to supply the proof necessary to establish apparent authority.

 Even more importantly, however, the representations must *cause* the reliance upon the care or skill of an apparent agent. As the comment to Restatement § 267 makes clear, "The mere fact that acts are done by one whom the injured party believes to be the defendant's servant is not sufficient to cause the apparent master to be liable. There must be such reliance upon the manifestation as exposes the plaintiff to the negligent conduct." *Restatement (Second) of Agency* § 267 com-

ment a. Here, this requirement is not met. For section 267 to apply, Porter would have had to present evidence that his decision to allow Dr. Schneider to perform surgery on him was made because he believed that Dr. Schneider was an agent of St. Joseph Hospital. This he did not do. When Porter entered the emergency room with a collapsed lung, knowing, because of previous collapses, that a tube would need to be inserted to allow it to inflate, he was told that "we called Dr. Schneider [and] he's our best man for this problem." The tube was inserted by Dr. Schneider, and the immediate emergency medical problem ended. Porter knew, before he ever entered St. Joseph Hospital, that if his lung collapsed again, surgery would be necessary to correct the problem. Porter and Schneider discussed such surgery the day after the emergency treatment. Dr. Schneider told Porter that while he could do the surgery, Porter could return to Illinois to have the surgery done and that he would help get him into a situation where he could return to Illinois if he so chose. Porter's friend, James Lambert, testified that when he saw him on Sunday, April 12, Porter was thinking about the surgery and had not decided what to do. There is no evidence that any hospital employees participated in any of these discussions. Porter, uncertain as to what he wanted to do, waited two days before deciding to allow Dr. Schneider to proceed.

Therefore, Porter's decision to allow Dr. Schneider to perform the surgery was made in a non-emergency situation after consultation with Dr. Schneider and considerable thought and pondering by Porter. There simply is no evidence to suggest that the brief statement made in the emergency room, relating solely to the specific problem treated in the emergency room, later caused Porter to select Dr. Schneider to perform surgery on him. We must con-

hospital and that's why I was called." Porter testified that he had no conversation with Dr. Schneider about the terms of their doctor-patient relationship, and that the emergency room physician did not describe Dr. Schneider as the

"on-call physician." Even if this conflicting testimony is resolved in favor of Porter, nothing in it supplies a basis for concluding that Dr. Schneider was clothed with apparent authority.

clude, even if we assume that the rule of section 267 applies in this case, that the evidence does not create a submissible case under that section and, hence, that the district court did not err in granting judgment notwithstanding the verdict for St. Joseph Hospital.[7]

We affirm the judgment of the district court.

---

**7.** Porter also asserts error in the verdict directing instructions and argues that the hospital both submitted and objected to its own verdict director. As we find that no submissible case against the hospital existed, we need not examine these contentions.