TRACTOR–TRAILER SUPPLY COMPA-
NY, a corporation, Plaintiff-Appellant,

v.

WILBUR WAGGONER EQUIPMENT
RENTAL AND EXCAVATING CO.,
INC., Defendant-Respondent.

No. 36499.

Missouri Court of Appeals,
St. Louis District,
Division Four.

April 27, 1976.

Motion for Rehearing or Transfer
Denied June 15, 1976.

Application to Transfer Denied
Sept. 13, 1976.

Zimbalist, Schramm & Walker, Clayton,
Harvey I. Feldman, St. Louis, for plaintiff-
appellant.

Kenney, Leritz & Reinert, Joseph L. Ler-
itz, Frank C. Mansfield, St. Louis, for de-
fendant-respondent.

NORWIN D. HOUSER, Special Judge.

Tractor-Trailer Supply Company appeals
from an adverse judgment rendered on a
jury verdict for Wilbur Waggoner Equip-
ment Rental & Excavating Company in
Tractor-Trailer's suit for damages to its
building and contents when a wall of an
adjacent old brewery building collapsed
during demolition and fell upon plaintiff's
main store building.

Appellant's first two points assign error
in the giving and refusal of jury instruc-
tions but we need not consider alleged pro-
cedural errors because appellant did not
make a submissible case of liability for the
jury to consider.

The damage occurred when a headache
ball, suspended from a crane, while being
used to knock out inside partitions and
break up inside floors of the 6-story brew-
ery building, broke off a column in the
middle, causing a floor to fall and strike the
next lower floor, which put pressure on the
outside wall, causing it to fall outward and
down onto appellant's building. . The crane
was owned by and the crane operator was
in the general employ of respondent. One
Willard Hart, who had a contract to demol-
ish the building, rented the crane from re-
spondent company, which also furnished its
own employees as operators of the crane
and other rented equipment.

Appellant relies upon the doctrine of re-
spondeat superior, and the cases of *Parlow
v. Dan Hamm Drayage Co.,* 391 S.W.2d 315
(Mo.1965); *Standard Oil Co. v. Anderson,*
212 U.S. 215, 29 S.Ct. 252, 53 L.Ed. 480
(1909), adopted in such Missouri cases as
*Schepp v. Mid City Trucking Co.,* 291
S.W.2d 633 (Mo.App.1956); *Wills v. Belger,*
357 Mo. 1177, 212 S.W.2d 736 (1948), and
*O'Brien v. Rindskopf,* 334 Mo. 1233, 70

S.W.2d 1085 (1934). According to appellant the vital question is not who controlled the crane but rather who controlled or had the right to control the operator of the crane . . . who was the master? Appellant says the answer to the question "Whose servant was the crane operator at the time the accident occurred?" fixes liability under the principle of respondeat superior; that the crane operator was respondent's employee; that he was under the exclusive control of respondent; that there was no probative evidence to support the verdict.

Contrarily, respondent contends the undisputed facts show without question that appellant has no cause of action against respondent. Respondent seeks to distinguish Parlow on the facts and claims this case is governed by *McFarland v. Dixie Machinery & Equipment Co.*, 348 Mo. 341, 153 S.W.2d 67 (1941); *Wright v. Habco, Inc.*, 419 S.W.2d 34 (Mo.1967); *Reichert v. Jerry Reece, Inc.*, 504 S.W.2d 182 (Mo.App. 1973), and *Ballard v. Leonard Bros. Transport Co., Inc.*, 506 S.W.2d 346 (Mo.1974).

Willard Hart went to respondent's heavy equipment rental place of business, looked over their equipment, selected and rented what he wanted. Respondent delivered the machinery to the job, and rented or furnished to Hart its employees Flougher, a crane operator; Fitzpatrick, a caterpillar tractor operator and Smith, a truck crane driver and oiler. Respondent's employees were on the demolition job one and a half to two months prior to the accident. In all they stayed on the job 8–12 weeks. These men were hired by, paid by and assigned to the job by respondent. On various jobs respondent's president Waggoner would give respondent's employees instructions as to whom they were going to work for, location of the job, what they were going to do, type of work, and to whom they were to report. In this case Waggoner told them they were going to a wrecking job for Hart and to report to Hart at the job site, but Waggoner did not give them any instructions on the details of the work they were to do for Hart; this was handled by Hart and Hart's employees. Respondent's employees kept their own time books, turned them into respondent weekly, and picked up their paychecks from respondent's office. Each working day they went directly to the job site. When day's work was done they went directly home, without checking in at respondent's office. During occasional visits to the job site Waggoner heard Hart give these employees instructions and observed them carry out Hart's instructions; heard Hart instruct the highlift operator with respect to loading brick into the dump trucks ·and ·instruct· crane operators · to "knock this wall down" or "knock this piece down." Hart would "direct them on the details of the work." Waggoner did not interfere in any way with Hart's instructions because he had "nothing to say" with respect to what Hart was doing. Waggoner told Smith to take instructions from Hart. Smith reported to Hart; took instructions from Hart. Hart would point out what work he wanted done. Smith also took instructions from Hart's foreman, who would tell him to knock down a certain wall, or column, or "Drop the ball on the floor and knock this one floor down," etc. Smith testified, "In other words we more or less just worked as directed by [Hart's] foreman." Fitzpatrick confirmed that he took directions from Hart or Hart's foreman on what to do; what bricks to load onto trucks with the highlift and "which ones not to mess with"; that they would point out what he was to do and what he was not to do, and that Waggoner never gave him any instructions on how he was to work on that job. Flougher testified he always asked Hart what he wanted done and how he wanted it done—"what he thought would be the best way to go about doing it and that's what I done"; that he also followed instructions given him by Hart's foreman; that Waggoner never gave him any instructions "on how to operate that job." Flougher never disagreed with Hart or his foreman in the matter of taking orders from them. He always agreed "and went along with what they wanted to do. I didn't contradict them because they were there doing the job and they were telling us

what to do. We weren't telling them what to do."

On the day of the casualty respondent's employees Smith and Flougher were on duty. Fitzpatrick was not on the job that day (a Saturday), having been told by Hart that he did not want to have to pay him double time. Hart's original plan was to tighten a 25-foot steel beam against the outside wall to put pressure on the wall and thereby keep it from falling while knocking out the inside walls and floors but Hart abandoned this plan due to the absence of caterpillar operator Fitzpatrick. Smith suggested they not proceed without the caterpillar operator but Hart's foreman said they would go ahead and do the best they could. Hart's foreman then gave Flougher, the crane operator, detailed instructions on how the crane and headache ball should be used to demolish the building, viz: knock the inside wall down, beat the floor a little bit to crack and break it up by bouncing the headache ball on the floor, then drop down to the next floor and knock down a certain upright beam or column and let the floor drop down. Flougher followed what he was told to do by Hart's foreman. He knocked down the inside wall, bounced the ball on the floor a dozen times until the floor was broken up, then dropped the ball down and knocked the column loose. The floor descended, the column fell toward the outside wall, and the falling debris forced the outside wall to collapse. Flougher verified the fact that the operations on the day the wall collapsed were done according to Hart's foreman's instructions—"according to what he wanted done." Flougher "worked the way [Hart's foreman] wanted it done." Respondent could remove Flougher, Fitzpatrick and Smith from the job and reassign them to a different job. After the collapse Hart suspended crane operations while the insurance company investigated and Waggoner did remove the men and equipment from the job and reassigned them to other work during this period.

"The essential elements constituting a 'borrowed servant' relationship have been stated several times. Essentially, they are: '(a) consent on the part of the employee to work for the special employer; (b) actual entry by the employee upon the work of and for the special master pursuant to an express or implied contract so to do; and (c) power of the special employer to control the details of the work to be performed and to determine how the work shall be done and whether it shall stop or continue.' *Ellegood v. Brashear Freight Lines, Inc.,* 236 Mo. App. 971, 162 S.W.2d 628 (1942); *Feldmann v. Dot Delivery Service,* 425 S.W.2d 491 (Mo.App.1968)." *Ballard v. Leonard Brothers Transport Co., Inc.,* supra, 506 S.W.2d l. c. 350[2]. Other principles governing this type of case were developed on page 351 of the report of Ballard. All of the essential elements necessary to show that at the time in question Flougher and his associates were special employees of Hart under the borrowed servant doctrine, and that they had been severed from their general employer insofar as this operation was concerned, as developed through the years in the case law of this State, appear in this case. Without a laborious review and comparison it is sufficient to say that the cases cited by appellant are distinguishable on the facts.

The consent of Flougher, et al. to work for Hart may be implied from their acts and conduct in assuming the role of employee of Hart over a period of several weeks, their general acceptance of the employment and their deliberate and informed submission and obedience to orders. *Wright v. Habco, Inc.* supra. That this consent was given pursuant to an implied contract to work for the special master inheres in the relationship shown. Hart's power to control the details of the work and whether it should stop or continue was made clearly evident, and stands without contradiction in this transcript.

The undisputed evidence demonstrates that respondent surrendered and relinquished its control over its employees for the time being in the performance of the demolition operations and yielded to Hart

and Hart's foreman full authoritative direction and control over its employees, not only as to the result to be accomplished but also as to the details of the work and the method of performing it. Hart and Hart's foreman had the sole and exclusive right, during working hours on the job, to order and direct the physical activities and movements of Smith, Fitzgerald and Flougher, and of the machinery they were operating, in doing the demolition work, and to specify the methodology, tactics and strategy to be employed in applying the necessary force to accomplish their purpose. Furthermore, in case of a conflict of judgment between Hart or Hart's foreman and respondent's crane operator as to the advisability of a certain proposed course of action the former had the power to overrule the latter's judgment and enforce their own judgment. Hart and his foreman not only had the right to exercise their own judgment in such matters, but actually put the right into practice. This is not a case of the rental of machinery and operators for a short time to perform a specific job or a few specific jobs; the equipment and operators were rented to do generally the work in which Hart was engaged, for an extended period of time— from eight to twelve weeks. During this entire time Hart personally or through his foreman was the boss, the master, the man in charge. Respondent's president Waggoner neither reserved nor exerted any control or right to direct respondent's employees in any manner, not even partially, in the performance of the work. In fact he took no part whatever in the operation. Waggoner's only control was his right to withdraw the men from the premises or discharge them from further employment, but as long as the employees were on the job Waggoner had no say-so with respect to their performance of the work. Doubtless Flougher and the other two men remained in the general employ of respondent throughout the entire time, but on the day the wall collapsed and with respect to the act which precipitated the casualty (knocking out the upright support column) Flougher was in the special employ of Hart, performing services essentially for Hart; services which Hart and his foreman had the full, complete and exclusive right to control and direct, *Reichert v. Jerry Reece, Inc.*, supra, 504 S.W.2d l. c. 186[8]; services actually controlled by Hart's foreman. With respect to that act there is no room for the application of the doctrine of respondeat superior as between Flougher and respondent; Flougher was Hart's special employee, and there was a complete severance of Flougher from his general employment, in the performance of that act. The decision to knock out the support column was that of Hart's foreman alone; not Flougher's. In fact Flougher expressed the view that the inside demolition should not be done unless the outside wall was beam-supported, but in this he was overruled by Hart's foreman and ordered to proceed without the support. It cannot fairly be said, under these circumstances, that in knocking out the column, thereby causing the outer wall to collapse, Flougher was "performing the business entrusted to him by his general employer," so as to honor the inference referred to in Restatement of Agency 2d § 220, Comment c, pp. 486–487, that the actor remains in the employ of the general employer.

As in *Wright v. Habco, Inc.,* and *Ballard,* supra, we find no factual issue which should have been submitted to a jury.

Accordingly, the judgment is affirmed.

SMITH, C. J., and ALDEN A. STOCKARD, Special Judge, concur.