Cynthia J. BRICKNER, and Candace J. Brickner, a minor, by her next friend Rowell E. Burt, Plaintiffs–Appellants/Cross–Respondents,

v.

NORMANDY OSTEOPATHIC HOSPITAL, INC., Defendant–Respondent/Cross–Appellant.

Nos. 51820, 51842.

Missouri Court of Appeals, Eastern District, Division Five.

Jan. 19, 1988.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 2, 1988.

Mark I. Bronson, Newman & Bronson, St. Louis, plaintiffs-appellants/cross-respondents.

Kenneth C. Brostron, Amy Rehm Hinderer, Tina A. Odo, Lashly, Baer & Hamel, P.C., St. Louis, for defendant-respondent/cross-appellant.

CARL R. GAERTNER, Judge.

Upon retrial of a wrongful death claim on the issue of liability only, the jury found in favor of plaintiffs and the trial court entered judgment against defendant in the amount of $340,717.00. Plaintiffs appeal arguing that the trial court erred in failing to allow pre-judgment interest on the damages held in abeyance. Defendant, Normandy Osteopathic Hospital, cross-appeals contending that: (1) the trial court erred in holding the hospital vicariously liable for the alleged negligence of its employee, Dr. Smith, because Smith was the borrowed servant of the attending surgeon at the time of the alleged negligence; (2) the trial court erred in holding the hospital vicari-

ously liable for an error in the medical judgment of a physician/employee; (3) plaintiffs released their claim against the hospital by dismissing their claim against Dr. Smith; (4) the verdict director was improper because it confused and misled the jury on the issue of agency; and (5) the trial court improperly calculated the present value of the outstanding settlements with Doctors Olson and Bean when it entered judgment against the hospital. We affirm.

This is the second appeal from a wrongful death action involving a failure to diagnose testicular cancer. Decedent, James Brickner, at the direction of his family physician, Dr. Bean, entered Normandy Osteopathic Hospital on May 31, 1978. Dr. Bean suspected that Mr. Brickner had testicular cancer. On June 2, 1978, decedent underwent exploratory surgery of his left scrotum. The operation was performed by Dr. Smith, a second year surgical resident, at the hospital. Dr. Smith was supervised during the operation by Dr. Olson, a surgeon with staff privileges at the hospital who participated in its teaching program. After surgery, Dr. Smith informed decedent that he did not have cancer and that it had not been necessary to remove his left testicle during surgery.

On February 23, 1979, after continued pain and swelling, decedent went to the emergency room at Condell Memorial Hospital in Libertyville, Illinois. He again underwent exploratory surgery of his left testicle. During this second operation, the doctors discovered testicular cancer and removed decedent's left testicle. After further examination, doctors discovered that decedent was in an advanced stage of cancer. James Brickner died on December 1, 1980 of metastatic testicular carcinoma.

Decedent's wife and daughter filed suit for wrongful death against Normandy Osteopathic Hospital, David K. Bean, D.O., a family practitioner, J. P. Smith, D.O., a second year surgical resident at Normandy Osteopathic Hospital, and John Olson, D.O., a surgeon and urologist. Plaintiffs alleged that Doctors Smith, Olson, and Bean negligently failed to diagnose dece-

dent's testicular cancer. Specifically, plaintiffs charged that Dr. Smith and Dr. Olson negligently failed to perform a biopsy or remove decedent's testicle during exploratory surgery of decedent's left scrotum.

Prior to trial, Dr. Olson settled with plaintiffs for $200,000.00. Plaintiffs then voluntarily dismissed their claim against Dr. Smith with prejudice before the case was submitted to the jury. Considering only the remaining claims against Dr. Bean and Normandy Osteopathic Hospital, the jury found in favor of the hospital and against Dr. Bean. They assessed plaintiffs' damages at $1,000,000.00. Due to instructional error, however, the trial court granted plaintiffs a new trial as to the hospital. Both the hospital and Dr. Bean appealed the decision in the first trial.

While the first appeal was pending, Dr. Bean and plaintiffs agreed to a structured settlement. Thereafter, we affirmed the trial court's decision to grant plaintiffs a new trial, but limited the new trial to the issue of liability. *Brickner v. Normandy Osteopathic Hospital, Inc.*, 687 S.W.2d 910 (Mo.App.1985). Should the second jury find the hospital liable, we instructed the trial court to enter judgment in the amount of $1,000,000.00 less the present value of the outstanding settlements with doctors Bean and Olson.

Upon re-trial the jury found the hospital liable and the trial court entered judgment in the amount of $340,717.00. The Brickners and the hospital both appeal the decision. We turn first to the hospital's cross-appeal.

### APPEAL OF NORMANDY OSTEOPATHIC HOSPITAL

The hospital contends that the trial court erred in denying its motion for judgment notwithstanding the verdict because plaintiffs failed to establish liability on the part of hospital. We note at the outset that plaintiff did not allege any direct negligence against the hospital, but sought only to hold the hospital liable for the acts of its employee, Dr. Smith. The hospital argues that it cannot as a matter of law be vicari-

ously liable for the acts of Dr. Smith because: (1) at the time of the alleged negligence, Dr. Smith was the borrowed servant of the attending surgeon, Dr. Olson; and (2) the alleged negligence involved the exercise of a physician's medical discretion over which the hospital had no control.

In reviewing the issue of liability we look only to the evidence most favorable to the prevailing party below, disregarding all evidence and inferences to the contrary. *Norris v. Jones*, 687 S.W.2d 280 (Mo.App. 1985).[1] The evidence favoring plaintiffs was as follows: Dr. Smith was a second year resident employed by the hospital in a surgical residency program. As part of its residency program the hospital required Dr. Smith to be present at the hospital from 7:00 a.m. to 7:00 p.m., attend to his assigned patients prior to and after surgery, and either assist in surgery or perform surgery under supervision depending on the type of operation. Dr. Smith was forbidden to accept private patients.

On June 2, 1978, Dr. Smith performed surgery on James Brickner under the supervision of the attending surgeon, Dr. Olson. Under the guidelines established for its residency program, the hospital allowed second year residents to perform scrotal explorations under supervision. The surgery was performed in "teamwork" fashion. Although the supervising surgeon had the "most" decision-making authority, Dr. Smith was required to assist in the patient's diagnosis and could have taken a biopsy of decedent's testicle without an express instruction from Dr. Olson.

Plaintiff's expert, Dr. Milner testified that he believed with a reasonable degree of medical certainty that Dr. Smith failed to adequately examine the testicle while it was exposed during surgery and, therefore missed the cancer diagnosis. Dr. Hendricks, a second expert, testified that the type of surgery performed on decedent was typically done by surgical residents with a surgeon assisting. He stated that in his opinion had Dr. Smith performed a biopsy cancer would have been discovered. The

hospital argues that, as a matter of law, Dr. Smith was the borrowed servant of the surgeon, Dr. Olson.

■ A general employer may use the borrowed servant doctrine as a defense when these elements are present: (a) consent upon the part of the employee to work for the special employer; (b) actual entry by the employee upon the work of the special master pursuant to an express or implied contract to do so; and (c) power of the special employer to control the details of the work to be performed and to determine how the work shall be done and whether it will stop or continue. *Ballard v. Leonard Brothers Transport Co., Inc.*, 506 S.W.2d 346, 350 (Mo.1974); *Tractor–Trailer Supply Co. v. Wilbur Waggoner Equipment Rental and Excavating Co., Inc.*, 539 S.W.2d 465, 467 (Mo.App.1976). Although the evidence in this case supports a finding of each of these elements, our inquiry, does not end with this finding.

■ Where, as here, the borrowed servant doctrine is asserted by the general employer as a defense to an action by a third party to recover for damages caused by the negligence of the employee in performing the work of the special employer, it is encumbent upon the general employer to prove, in addition to the three elements enumerated above, a total relinquishment of any right of control over the conduct of the employee insofar as the particular work is concerned.

To escape liability the general employer must surrender full control of the employee in the performance of the particular work, it not being sufficient if the servant is partially under the control of a third party. Cases so holding include *McFarland v. Dixie Machinery and Equipment Co.*, 348 Mo. 341, 153 S.W.2d 67; and *Wills v. Belger*, 357 Mo. 1177, 212 S.W.2d 736. *See also* Restatement, Second, *Agency* § 227, with.reference to factors to consider.

1. It should be noted that in the first appeal by plaintiffs from the judgment in favor of the hospital, this rule required an opposite view of the evidence.

*Koirtyohann v. Washington Plumbing & Heating Co.,* 471 S.W.2d 217, 219–20 (Mo. 1971).

■ The factors pertinent to our inquiry set forth in the above-cited section of the Restatement include:

In the absence of evidence to the contrary, there is an inference that the actor remains in his general employment so long as, by the service rendered another, he is performing the business entrusted to him by the general employer. There is no inference that because the general employer has permitted a division of control, he has surrendered it.... [A] continuation of the general employment is indicated by the fact that the general employer can properly substitute another servant at any time, that the time of the new· employment is short, and that the lent servant has the skill of a specialist.

\* \* \* \* \* \*

The fact that he obeys the request of the temporary employer as to the act does not necessarily cause him to be the servant of such employer. If, however, the temporary employer exercises such control over the conduct of the employee as would make the employee his servant were it not for his general employment, the employee as to such act becomes a servant of the temporary employer. If the employee does the very act directed by the temporary employer, the latter is responsible for having directed it, and the first employer is responsible as a master if the act is within the scope of his general employment.

Restatement (Second) of Agency § 227 comment b, c (1958). Equally pertinent is section 226 of the Restatement:

A person may be the servant of two masters, not joint employers, at one time as to one act, if the service to one does not involve abandonment of the service to the other.

Thus, the biblical admonition[2] notwithstanding, a man can serve two masters simultaneously, provided the interest of the masters are not so adverse and antago-

nistic that the intent to serve one necessarily excludes an intent to serve the other.

■ We have been referred to and independent research has disclosed no Missouri cases which decide the precise issue involved: whether a hospital is vicariously liable for the negligence of an employee who is under the proximate direction and control of an independent physician in charge of a surgical procedure. A majority of other jurisdictions which have addressed the issue, however, conclude that both the surgeon and the hospital may be liable for the negligence of the hospital's employee during surgery.

In *Kelley v. Rossi,* 395 Mass. 659, 481 N.E.2d 1340, 1342 (1985), the court noted that as a general rule a resident physician is the servant of the hospital and a presumption exists that the resident remains in the employ of the hospital unless evidence is produced to the contrary. In *Foster v. Engelwood Hospital Association,* 19 Ill.App.3d 1055, 313 N.E.2d 255 (1974), plaintiff sought damages for a nurse's negligence from both the hospital and the attending surgeon. The jury returned a verdict against both defendants, but the trial court granted the surgeon's motion for judgment notwithstanding the verdict. On appeal the court held that both the hospital and the surgeon were liable for the nurse's negligence. 313 N.E.2d at 260. Quoting from an earlier case, *Norland v. Poor Sisters of St. Francis,* 4 Ill.App.2d 48, 59, 123 N.E.2d 121, 127 (1954), the court rejected application of the borrowed servant doctrine:

It is part of the hospital's business to furnish [physicians with] the use of [employees], and the fact that during the period of the operation an [employee] is subject to the direction of a physician does not change the relationship ... the furnishing of the [employee] necessarily involves the circumstances that the [employee] furnished will carry out the directions of the physician in charge.

**2.** No man can serve two masters: for either he will hate the one, and love the other; or else he will hold to the one, and despise the other. Ye cannot serve God and Mammon. Matthew 6:24.

*Id.* 313 N.E.2d at 259–60. The court also concluded that a physician is liable for a hospital employee's negligence if he exercises control and supervision over the employee even though the surgeon retains less than that degree of control necessary to establish a traditional master/servant relationship. *Id.* 313 N.E.2d at 260. The question of whether the doctor retains control or supervision over the negligent employee is a question of fact for the jury. *Id.* 313 N.E.2d at 261.

In *Pratt v. Stein,* 298 Pa.Super. 92, 444 A.2d 674, 702 (1982), the Pennsylvania court wrestled with the borrowed servant problem. The court concluded that the trial court had properly instructed the jury to find in favor of the hospital only if the negligent hospital personnel were under the "sole control" of the surgeon and serving the interests and purposes of only the surgeon at the time of the alleged negligence. *Id.* 444 A.2d at 703. The trial court instructed the jury that "if a hospital ... lends [its] personnel to someone else, then at that time the personnel can be servants of the borrower, or can still be servants of just the lender, or can be servants of both of them, the lender and the borrower." *Id.* 444 A.2d at 702.

After noting that "[i]n few other areas where the doctrine of respondeat superior may be potentially applicable is the issue of control as crucial or as difficult to resolve as it is in many doctor-hospital relationships," the court in *City of Somerset v. Hart,* 549 S.W.2d 814, 816 (Ky.1977), held that the hospital could not escape liability under the borrowed servant doctrine if the acts of the hospital employee were of mutual benefit to both the surgeon and the hospital. The court stated that "[f]requently, if not most often, the nurse or other employee who is temporarily lent to the physician or surgeon, in every realistic sense, continues to carry on [their] hospital duties." *Id.* at 817. *See also* Annot., *Liability of Hospital or Sanitarium for Negligence of Physician or Surgeon,* 51 A.L.R. 4th 235 (1987).

■ Missouri follows the principle relied on in these cases. In order to escape liability, the general employer must have relinquished all control and authority over the employee to the special employer. *Tractor–Trailer Supply Co.,* 539 S.W.2d at 467. There is no inference that because the general employer permitted a division of control that he surrendered all of his control. Restatement (Second) of Agency § 227 comment b (1958). "The fact that [an employee] obeys the requests of a temporary employer ... does not necessarily cause [the employee] to be the servant of such employer." Restatement (Second) of Agency, *supra* at 503, *cited with approval in Gerfers v. Missouri–Illinois Tractor & Equipment Co.,* 372 S.W.2d 503, 507 (Mo. App.1963).

Reviewing the record in this case in light of the principles discussed above, we find the evidence supports a conclusion that Dr. Smith remained the servant of the hospital during decedent's operation. The hospital hired Dr. Smith and allowed him to practice his medical skills by performing operations such as the one performed on James Brickner. Smith's employment was controlled by the hospital's "Department of Surgery Resident's Training Program" syllabus, which set forth in detail the duties of a resident physician including those arising during surgery. For example, under these regulations: Dr. Smith was required to devote his full time to residency training; his hours of work were scheduled by the hospital; he was required to keep a log of his surgical experiences; he was told to question the orders of an attending physician if he believed them to be erroneous; and he was required to dictate a report describing any surgery he performed. Failure to satisfactorily perform any of his duties, including the performance of his surgical duties, could result in the hospital terminating his employment.

Although Dr. Olson had supervisory authority and control over Dr. Smith during James Brickner's operation, this fact does not indicate even a temporary suspension or interruption of Smith's employment by or accountability to the hospital. On the contrary, at the time of surgery, Smith was performing the very work for which the

hospital had hired and was paying him. In fact, Smith was expected to exercise independent medical judgment in the operating room. He could have performed a biopsy on decedent's testicle without the prior consent of Dr. Olson.

Viewed in the light most supportive of the verdict, the evidence fails to establish that the hospital relinquished or abandoned its right of control over Dr. Smith when he entered the operating room, or that by coming under the temporary supervision of Dr. Olson, Smith abandoned his service to the hospital. We cannot, therefore, as a matter of law, hold that Dr. Smith was solely under the control of and serving only the interest of Dr. Olson during surgery, thereby insulating the hospital from liability under the borrowed servant doctrine. *See e.g., Hollant v. North Shore Hospital, Inc.,* 24 Misc.2d 892, 206 N.Y.S.2d 177 (1960).

We need not decide under the circumstances of this case whether Dr. Olson was also liable for acts of Dr. Smith during surgery. We have determined that the hospital did not relinquish all control over Dr. Smith, and therefore, remained at least jointly liable for Dr. Smith's negligence. Whether or not the evidence would support a finding that Dr. Smith was also acting as a servant to Dr. Olson, thereby making Olson vicariously liable, is not before us on appeal.

■ The hospital next argues that it did not have control over the exercise of Dr. Smith's medical judgment while operating on decedent, and therefore, cannot be liable for his failure to diagnosis testicular cancer. Some jurisdictions draw a distinction between medical and administerial acts of hospital employees or resident physicians and interns and refuse to hold the hospital responsible for the negligent medical judgment of an employee. *See e.g., Rodriquez v. City and County of Denver,* 702 P.2d 1349 (Colo.App.1984); *Dickinson v. Mailliard,* 175 N.W.2d 588, 595 (Iowa 1970). Missouri has never recognized a distinction between medical and administerial acts with regard to a hospital's liability for an employee's negligence. Indeed, past deci-

sions have recognized that a hospital can be liable for the negligent medical decisions or treatment of a physician employed by the hospital. *Gilstrap v. Osteopathic Sanatorium Co.,* 224 Mo.App. 798, 24 S.W.2d 249, 255 (1929); *Eichelberger v. Barnes Hospital,* 655 S.W.2d 699 at 708 (Mo.App. 1983).

■ Furthermore, the hospital's argument overlooks the evidence showing that it exercised control of each step over a resident physician's progress toward surgical certification. Throughout his resident training program, the hospital directed Dr. Smith's activities and authorized him to perform increasingly complex procedures. The hospital reaped the benefit of Dr. Smith's labor during his training period. While it did not and could not dictate Dr. Smith's every move while in surgery, the hospital had supervisory control over his performance as a resident and could at any time dismiss him for poor exercise of his medical judgment. Liability premised on the theory of respondeat superior does not require plaintiff to prove the employer had actual control over its employee's discretionary judgment as long as the employee's conduct is within the scope and course of employment. *Bova v. St. Louis Public Service Co.,* 316 S.W.2d 140 (Mo.App.1958); *Carter v. Willert Home Products, Inc.,* 714 S.W.2d 506, 512 (Mo. banc 1986). Under MAI 13.06 the jury was instructed to find for the plaintiff if they found that Dr. Smith was serving the business of the hospital according to an express or implied agreement and that the hospital controlled or had the right to control the physical conduct of Dr. Smith. There was ample evidence to support the jury's finding for plaintiff on this issue.

In its third point, the hospital argues that plaintiffs failed to establish causation since the uncontradicted testimony established that Dr. Smith had no authority to biopsy or remove decedent's testicle. In support of this claim, the hospital points to testimony of Dr. Olson, who testified that Dr. Smith had no authority to biopsy or remove the testicle. The jury could have disbelieved this testimony. *Sunset Acres*

*Motel, Inc. v. Jacobs,* 336 S.W.2d 473 (Mo. 1960).

Plaintiffs may establish causation by circumstantial evidence, which includes favorable inferences drawn from all the evidence. *Honey v. Barnes Hospital,* 708 S.W.2d 686, 694 (Mo.App.1986). Dr. Owen testified that Dr. Smith would not have needed "veto power" over Dr. Olson to take a biopsy of decedent's testicle. Plaintiffs' expert, Dr. Hendricks, testified that normally in operations such as the one performed on the decedent decisions are reached by mutual discussion and an attending surgeon would not have overruled a resident physician who was performing the surgery if the resident thought a biopsy was necessary. Dr. Milner testified that Dr. Smith failed to adequately examine decedent's testicle during surgery, and therefore, Dr. Smith missed the diagnosis. Dr. Milner and Dr. Williams both testified that at the time of surgery decedent's testicular cancer was in stage I and that a person diagnosed with stage I testicular cancer has nearly 100% chance of survival. The hospital's argument is simply not supported by the record.

We find that plaintiffs presented sufficient evidence of causation between the alleged negligence of Dr. Smith and decedent's death to submit the issue to the jury.

The hospital further contends that plaintiffs failed to make a submissible case on the issue of negligence in that plaintiff's experts conflicted in their opinions as to what Dr. Smith should have done under the circumstances of this case. If contradictory statements can be reasonably explained and if from a fair consideration of all the circumstances a jury could reasonably determine what should be accepted as true, then the credibility of the witnesses and the weight to be given their testimony are questions for the jury. *Carthen v. Jewish Hospital of St. Louis,* 694 S.W.2d 787 (Mo.App.1985). Here, all of plaintiffs' experts testified that the correct surgical standard to diagnose testicular cancer would be either to biopsy the testicle or remove it for pathological examination. Although some experts testified that they

would have removed the testicle immediately under the circumstances rather than first performing a biopsy, Dr. Smith failed to do either of these things. Viewing the evidence and the inferences to be drawn therefrom in the light most favorable to plaintiff, we believe the evidence was sufficient to make a submissible case that Dr. Smith's actions caused or contributed to Mr. Brickner's death. *Carthen, supra,* at page 793; *Cignetti v. Camel,* 692 S.W.2d 329, 335 (Mo.App.1985).

Normandy Osteopathic Hospital next contends that plaintiffs released their claim against the hospital by voluntarily dismissing their claim against Dr. Smith prior to submitting the case to the jury. Voluntary dismissal with prejudice of a claim against an employee does not prevent plaintiff from proceeding with a claim against the employer. *Denny v. Mathieu,* 452 S.W.2d 114, 119 (Mo.banc 1970). On similar facts, the Supreme Court held in *Denny* that the dismissal with prejudice of plaintiff's claim against the employee did not amount to an adjudication on the merits so as to bar plaintiff from proceeding further against the employer. *Id.* The decision in *Denny* is controlling in this case. Point denied.

In its sixth point, the hospital contends that it should have been granted a new trial because the verdict director erroneously failed to submit the issue of whether Dr. Smith was "diagnosing cancer" within the scope and course of his employment. The verdict director read as follows:

Your verdict must be for plaintiffs Cynthia Brickner and Candace Brickner, if you believe:

First, plaintiffs were the spouse and the child of James L. Brickner, and

Second, Dr. Smith was performing surgery within the scope and course of his agency for defendant Normandy Osteopathic Hospital, Inc., on June 2, 1978, and

Third, Dr. Smith failed to diagnose testicular cancer, and

Fourth, Dr. Smith was thereby negligent, and

Fifth, such negligence directly caused or directly contributed to cause the death of James L. Brickner.

The hospital argues that the ultimate issue of fact in this case was not whether Dr. Smith was performing the operation on decedent within the course and scope of his employment, but whether he failed to "diagnose cancer" within the course and scope of his agency for the hospital. The hospital contends that it was prejudiced because the jury could more easily find the hospital had a right to control the manner in which a physician-employee performs surgery than the manner in which the physician made a diagnosis. The hospital also argues that the instruction misled the jury into thinking that the performance of surgery was an issue rather than the failure to diagnose.

 Whether an instruction is confusing depends upon "how it would be understood by a jury of ordinarily intelligent laymen." *Eichelberger v. Barnes*, 655 S.W.2d at 706 (citing *Breshears v. Union Electric Co.*, 373 S.W.2d 948, 954 (Mo. 1964)). It is not disputed that the purpose of the surgery on Mr. Brickner was diagnostic: to determine if the swelling of his testicle was a cancerous tumor. Plaintiffs clearly contended throughout the trial that Dr. Smith negligently failed to diagnose plaintiff's cancer during surgery by failing to biopsy or remove decedent's testicle. With equal clarity, the defendant argued that there was no reason to biopsy or remove the testicle during surgery because neither Dr. Smith nor Dr. Olson saw any indication of cancer. There was also testimony presented on both sides as to whether Dr. Smith had the authority or discretion to perform a biopsy or remove the testicle. Given the evidence, we cannot believe that the verdict-director prejudiced defendant in any way. Furthermore, the definitional instruction directed the jury to find that Dr. Smith was acting within "the scope and course of his agency" for the hospital if (1) he was serving the business of defendant according to an express or implied agreement with defendant, and (2) defendant Normandy Osteopathic Hospital either controlled or had the right to control the physi-

cal conduct of Dr. Smith. We do not believe the jury was misled or confused by the fact that the verdict-director instructed them to find against defendant if Dr. Smith was "performing surgery" rather than "diagnosing cancer" within the course and scope of his agency. *Struemph v. McAuliffe*, 661 S.W.2d 559 (Mo.App.1983).

Finally, the hospital alleges the trial court erred in calculating the amount of the judgment. In the first trial the jury found against Dr. Bean only, and assessed plaintiffs' damages at $1,000,000. The trial court, however, granted plaintiffs a new trial as to the hospital. Both Dr. Bean and the hospital appealed. During the pendency of the appeal, plaintiffs and Dr. Bean entered into a structured settlement. We ordered a new trial of plaintiff's claim against the hospital but limited the trial to the issue of liability only. We ordered the $1,000,000 verdict held in abeyance and, in the event the hospital was found liable, we directed the trial court to enter judgment against the hospital in the sum of $1,000,-000 less credit for the present value of the settlements with Dr. Bean and Dr. Olson. Following the jury's verdict in favor of plaintiffs, the trial court heard expert testimony from qualified economists presented by both parties. As to the present value of plaintiff's structured settlement with Dr. Bean, the court accepted the testimony of plaintiffs' expert, Dr. Leroy Grossman, and entered judgment against the hospital in the sum of $340,717.00, allowing a credit of $659,283.00 as the present value of the two settlements. The hospital contends that the trial court erred in accepting the testimony of Dr. Grossman and that it should receive a credit in the amount of $774,-170.00.

 A defendant is entitled to a credit on a judgment equal to the sum a plaintiff has received from other joint tortfeasors as partial compensation for his damages. The consideration plaintiffs received for the dismissal of Dr. Olson was in the form of a lump sum payment of $200,-000.00, a fixed and determined value. The consideration plaintiffs received for the dismissal of their claim against Dr. Bean was

a lump sum payment of $155,000.00 plus an agreement for the payment of various sums at specified times over a period of years.[3] The hospital is entitled to a credit equal to the value to plaintiffs of the settlement agreement as of the date of the agreement. The fact that funds are invested by the defendant or his insurance company in order to guarantee the future payments, rather than being invested by the plaintiffs themselves, does not alter the value of what was paid and accepted in return for releasing Dr. Bean from liability. Thus, the consideration received by plaintiffs in return for the dismissal of Dr. Bean is measured not by what they will receive in the future, nor by the cost to the defendant of an annuity to guarantee such payments.[4]

The present value of a structured settlement is the amount of money needed today to generate the funds required to meet a schedule of future payments of specified amounts on specified dates. It is the total of future payments discounted by an annual percentage rate of interest superimposed for the time until each payment is due. The hospital does not disagree with this concept but challenges the 11% interest rate used by plaintiffs' expert in calculating the present, i.e. date of settlement, value to the plaintiffs.

In the first jury trial Dr. Grossman testified for plaintiffs that a discount rate of 8.5% should be used to determine the present value of James Brickner's future loss of wages. At the hearing to determine the present value of the structured settlement, he used a discount rate of 11%. The lower the discount rate used, the high-er the present value will be. Defendant argues that plaintiffs are improperly taking advantage of this mathematical principle by using a lower discount rate to calculate the present value of future damages and a higher rate to calculate the present value of the structured settlement, thereby reducing the amount of the hospital's credit against the $1,000,000 verdict. Dr. Grossman, applying the 11% rate, computed the present value of two settlements to be $659,283.00. Application of the 8.5% rate would result in a present value of $729,620.00. In effect, defendant's argument is that plaintiffs, having elected to take the benefit of the lower rate in computing damages, should be precluded from using a higher rate in computing the amount to be deducted from the verdict.

We see no inconsistency in the use of different discount rates for different purposes. Dr. Grossman explained that in calculating the present value of future wages during the contemplated work-life of James Brickner, the 8.5% rate was not based upon current interest rates. Rather, it is an assumed figure, based upon his expertise and experience, of the average interest rates available on secure investments over the next 30 years. Present value of future earnings is determined by application of the difference between this assumed discount rate and assumed wage increases, which is a "net real discount rate." *See Jones & Laughlin Steel Corp. v. Pfeifer,* 462 U.S. 523, 536–51, 103 S.Ct. 2541, 2550–58, 76 L.Ed.2d 768 (1983). Since there is historically a correlation between the fluctuations of interest rates and of wage in-

---

3. Under the agreement plaintiff Cynthia Brickner is guaranteed payments totalling $832,000.00 up to August 1, 2007. Thereafter she is to be paid $3100.00 per month for the remainder of her life. Plaintiff Candace Brickner is to receive guaranteed payments totalling $180,000.00 up to August 1, 2014.

4. Periodic payments received by a plaintiff in settlement of a damage suit are excludable from gross income under § 104(a)(2) of the Internal Revenue Code, as is the amount of a lump sum settlement. However, if a plaintiff invested the lump sum settlement, or purchased an annuity with the proceeds of a settlement, the income would be subject to taxation. Some authorities have expressed a concern that if information regarding the cost to the defendant of a structured settlement package is provided to the plaintiff, it could amount to a constructive receipt of the funds, thereby altering the tax advantages. *See* 39 Mo.Bar J. 181, 189 (1983). In addition to tax ramifications, other differences between cost to defendant and value to plaintiff may be found in acquisition and administrative expenses and the ability of an insurer to risk investment in a diverse portfolio including high risk-high yield securities as opposed to the conservative investment required to assure an individual of stable future income.

creases, the real net discount rate will remain relatively constant regardless of possible error in the assumptions.

On the other hand, the calculation of the present value of a structured settlement, according to Dr. Grossman, is based upon ascertainable fact: the rate of interest payable on a particular type of investment on the date of the settlement. The interest rate on high grade tax-free municipal bonds at the time of the structured settlement in this case was approximately 11%. The trial court as trier of fact was free to accept the testimony of Dr. Grossman. *Richard B. Curnow, M.D., Inc. v. Sloan,* 625 S.W.2d 605, 607 (Mo. banc 1981).

The defendant also contends the trial court erred in not taking into account the difference in tax consequences between a structured settlement and a lump sum payment equal to the present value of the settlement. Defendant argues that plaintiffs will pay no income tax on the payments under the settlement, but if they invested a lump sum, the income would be subject to taxation of a rate of at least 15%. Therefore, plaintiffs would require a larger sum in order to generate an equal future income. This argument overlooks Dr. Grossman's testimony that he used the lower rate of return on tax-free municipal bonds in order to compute the sum plaintiffs would require to generate future tax-free income. Thus, tax consequences were considered.

The trial court accepted Dr. Grossman's testimony and rejected the opposing theories of defendant's expert. We find no reason to depart from the principle of appellate review which requires us to give deference to the trial court's determination of the weight to be given to credible evidence. *Hoffmann v. Hoffmann,* 676 S.W.2d 817, 826 (Mo. banc 1984); *Milam v. Vestal,* 671 S.W.2d 448, 451 (Mo.App.1984).

## APPEAL OF CYNTHIA AND CANDACE BRICKNER

Plaintiffs contend that the trial court should have added interest onto the original damage award when it entered the judgment against Normandy Osteopathic Hospital. Plaintiffs argue that under sections 512.160.4 and 408.040, RSMo. 1986, they are entitled to interest on the original judgment from the date the original judgment was rendered. Section 512.160.4 states that:

> Upon the affirmance of any judgment or order, or upon the dismissal of any case, the appellate court may award to the respondent such damages not exceeding 10% of the amount of the judgment complained of as may be just, and when such judgment shall be affirmed for part of the sum of which judgment was rendered by the trial court, such part of said judgment shall bear lawful interest from the date of the rendition of the original judgment in the trial court.

Plaintiffs' reliance on this statute is misplaced. The hospital was found *not liable* on plaintiffs' claim at the first trial. On appeal this court merely affirmed the trial court's decision to grant plaintiffs' motion for new trial, we did not affirm a judgment or part of a judgment against defendant. Plaintiffs have cited several cases for the proposition that the statute applies in situations where the only contested issue upon retrial is the issue of liability. *See, Burger v. Wood,* 446 S.W.2d 436 (Mo.App.1969); *Ohlendorf v. Feinstein,* 670 S.W.2d 930 (Mo.App.1984); *Nelson v. Travelers Insurance Co.,* 102 Wis.2d 159, 306 N.W.2d 71, 77 (1981). In all of the above cases, however, the original judgment rendered in the first trial was in favor of the party who ultimately prevailed on the issue of liability. Likewise, plaintiffs' reliance on § 408.040 is misplaced. Section 408.040 provides that "interest shall be allowed on all money due upon any judgment or order of any court from the date of rendering the same." In the present case, there was no judgment against defendant until April 9, 1986. The statute does not afford a basis for imposition of interest prior to that date. A judgment bears interest only from the date of rendition. *Reimers v. Frank B. Connet Lumber Co.,* 273 S.W.2d 348 (Mo. 1954).

Since there can be but one judgment in any case, the judgment on the

**120**

$1,000,000 verdict was held in abeyance pursuant to the trial court's order of a new trial and our mandate on the first appeal. Therefore, plaintiffs' claim for interest on the judgment based upon statutes regarding post-judgment interest was inappropriate. Although not articulated by plaintiffs, the better argument is that plaintiffs were entitled to pre-judgment interest from the date of the verdict because the amount of the hospital's liability, if any, became fixed or readily ascertainable by computation at that time. Having posed this argument, we disagree with it.

 Pre-judgment interest may be allowed where the amount of damages for which a defendant may be liable is liquidated or readily ascertainable by computation according to a recognized standard. *Ohlendorf v. Feinstein,* 670 S.W.2d at 935. However, until the amount of damages become certain, no interest is generally allowable. *Id.* at 936; *Herberholt v. DePaul Community Health Center,* 648 S.W.2d 160, 162 (Mo.App.1983).

The rationale underlying the rule has been said to be "that where the person liable does not know the amount he owes he should not be considered in default because of failure to pay." *Fohn v. Title Insurance Corporation of St. Louis,* 529 S.W.2d 1, 5 (Mo. banc 1975).

Obviously, on the date of the original verdict the hospital could not be charged with knowledge of the amount it might have to pay if ultimately held liable. The hospital had been exonerated in the first trial and Dr. Bean alone was held liable. After the structured settlement, the amount of the hospital's potential liability remained uncertain. Although this amount was subject to computation under a mathematical formula, the discount rate was a disputed issue. Our remand of the case for a new trial on the issue of liability only fixed the total amount of plaintiffs' recovery, but not the portion for which the hospital ultimately might be responsible. It is not a case like *Senn v. Commerce–Manchester Bank,* 603 S.W.2d 551 (Mo. banc 1980) where the case was remanded to the trial court solely for the purpose of enter-

ing a modified judgment according to directions. Rather, our mandate required the trial court to conduct hearings in order to determine the present value of the settlement, an uncertain and disputed issue.

Accordingly, the judgment of the trial court is, in all respects, affirmed.

SATZ, C.J., and SIMEONE, Senior Judge, concur.